# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     PLAINTIFF, <br><br> v. <br><br> JOSE ANTONIO LINARES-CABRERA, <br>     DEFENDANT. | CASE NO.: 17-529 (ADC) |

## SENTENCING MEMORANDUM

TO THE HONORABLE AIDA DELGADO-COLON
UNITED STATES DISTRICT JUDGE
FOR THE DISTRICT OF PUERTO RICO:

COMES NOW, the Defendant, Jose Antonio Linares-Cabrera, by and through undersigned counsel and pursuant to the Federal Rules of Criminal Procedure, and respectfully states and prays as follows:

### I. The Rami Jhon's Unfortunate Fishing Trip

On July 27, 2017, Jose Linares-Cabrera ("Mr. Linares") departed Miches, Dominican Republic in his registered, wooden, yola-style fishing vessel. On board was Cristino Sanchez-Senda and two other fishermen from the Miches area. The group planned a multi-day fishing trip where they would employ multiple types of fishing techniques to maximize their effectiveness. As allowed by their permit, Mr. Linares and his fellow fisherman would head to the area by Cabo Engano and then into the waters west of Desecheo Island, an area known as prime fishing grounds. Mr. Linares loaded his vessel with fish traps constructed by one of his brothers, nets, lines, materials for "trolling," bait fish, blocks of ice, and a host of other materials needed for fishing. The vessel had no working GPS and the only functioning piece of electronics was a "fish finder."

At approximately midnight on July 28, 2017, a United States Coast Guard (USCG) vessel conducted an interdiction because Mr. Linares's vessel, the Rami Jhon, was allegedly "suspicious." The Rami Jhon was located 15 miles from the shore of the Dominican Republic and

1

only three miles into international waters at the time it was stopped. Mr. Linares had the navigation light on his boat (the only light on the vessel) fully lit at the time of the interdiction, and the bow of his boat was piled high with fish traps. The USCG concluded the light was noncompliant with international standards. They approached in a small inflatable boat with its lights off, intending to sneak up on the Rami Jhon to conduct the interdiction. Around the same time the USCG activated their sirens and flashing lights, the USCG observed Mr. Linares throwing something overboard. This was likely bait bags or other fishing equipment. The adrenaline-charged USCG members, however, immediately concluded Mr. Linares and his partners were smuggling narcotics and fired off several shotgun blasts. Mr. Linares and his companions were initially terrified and did not know who had surprised them and for what purposes. The fear eventually gave way to frustration and anger when the USCG insisted on boarding the vessel. Mr. Linares and his companions informed them the boat was a Dominican fishing vessel doing nothing wrong and he did not want to be boarded.

After the shotgun blasts, the situation grew more and more aggravating for both sides. Admittedly, Mr. Linares drove away from the USCG vessel for some time and refused several boarding attempts. The USCG eventually shot out the engine of Mr. Linares's vessel to stop it from moving. He subsequently provided the USCG with a Dominican Navy small dispatch authorization (authorizing the vessel to fish in the area) and surrendered without further issues. The USCG did not locate any narcotics despite have multiple air assets in the area where the incident occurred and having the small boat right next to the Rami Jhon nearly the entire time. Uncorrupted Ion Scans were all negative. Mr. Linares vehemently denies being engaged in any sort of smuggling venture.

## II. The Aftermath

After the USCG boarded, Mr. Linares and his companions were arrested and searched. As mentioned, they found nothing illegal or even inconsistent with fishing. Everyone on board the vessel explained they were there for fishing purposes. Mr. Linares was then transferred to a Coast

Guard cutter and kept on board for the next four weeks. He was kept chained to floor of the cutter and only allowed to move from that limited area to use the restroom and shower while under escort. His location left him partially exposed to the elements and his only clothing was a "Tyvek" jumpsuit.



(Photograph depicting the conditions aboard a Coast Guard cutter in a similar MDLEA case)

Mr. Linares and his companions were fed a diet that consistent mainly, if not exclusively, of rice and beans. Blood pressure spikes left him with shortness of breath and severe chest and head pain. Worst of all, Mr. Linares was not allowed to contact his family during this entire period. His wife informed the undersigned she was terrified and assumed he had died at sea. Mr. Linares has followed his time on the cutter with two separate stints in Mississippi and time here in Puerto Rico. He's had no visits, no commissary deposits, and little communication with his family. The entire period was, and is, absolute hell.

Mr. Linares's vessel – the same vessel he took out a loan to repair and fit for use – was destroyed by the USCG as a "hazard to navigation" despite floating perfectly at the time of its destruction. All his tramps, lines, nets, fish, ice, hooks, and other materials were also destroyed. Mr. Linares will return to the Dominican Republic without the primary instruments he used to

generate income and feed his family, no fish, a wife deservedly angry over his absence, and a rapidly deteriorating financial situation. Even after Mr. Linares is permitted to return to the Dominican Republic, the consequences of this criminal case will be severe.

### III. Personal History and Characteristics of Jose Linares-Cabrera

Mr. Linares was born on March 19, 1966, one of 16 children born to poverty-level butchers/meat cutters in the Miches area. He had little "childhood" in the normal sense of the word. He slept on the floor of his family's shack for the majority of his formative years. His ability to go to school ended in the third grade when his parents decided he could better support the family by staying at home. To this day, he has little ability to read or write. Work was a constant by the time Mr. Linares reached the age of ten. The only real memories he has of this time are of waking up at 5:00am to help his mother process, weigh, and prepare the day's meat for shipment. His remaining time was spent helping with other chores designed to help the family stay self-sufficient and avoid spending money on necessities. They lived as much as possible off the land. At the age of 15, Mr. Linares was tasked, along with his father, with building the family a new home. By this point the number of family members was well into the double digits and they simply did not all fit in the shack. He recalls collecting whatever wood could be found in the surrounding area so they could cobble it together into a ramshackle structure. These are the highlights of Mr. Linares's youth.

At the age of 18, Mr. Linares decided to strike out on his own and to start his own family. He built a thatched roof cabin while continuing to work long hours during the day helping his mother and father. After completing the cabin, Mr. Linares began to supplement his work during the day with fishing trips conducted during the night. This allowed him to increase his income and put additional food on the table. Mr. Linares's night trips began a love affair with fishing and the sea, something he has done --in one form or another-- for the last 30 years. Mr. Linares eventually transitioned to fishing full-time and made it his profession.

Mr. Linares fathered thirteen children of his own (David, Aziel, Dariel, Dasiel, MariCarmen, David, Joan, Juan Gabriel, Francisco, Dariana, Darisito, Karen, and Juan Gabriel), and spent his years working grueling hours to put food on the table, just as his parents had before him. His wife, Yarianis, works equally as hard trading a selling second-hand clothing in the markets of Miches and Santo Domingo. His family, as mentioned, has suffered greatly in Mr. Linares's absence. Bills are piling up, the income has been drastically reduced, and Yarianis is acting as a *de facto* single mother.

### IV. Sentencing Considerations

#### a. Mr. Linares's Prior Criminal Case

Mr. Linares is well aware this is the second incident of this nature on his record. He previously spent time incarcerated after he, along with numerous other migrants, attempted to repel a USCG boarding of their vessel near Aguadilla in 2005. Mr. Linares was on his way to try to obtain work in the coffee fields of Yauco, Jayuya and other places in western-Puerto Rico. He realized the obvious illegality of his act and afterwards promised himself he would never again return to Puerto Rico. When the USCG once again attempted to board his vessel during this incident, Mr. Linares wanted nothing to do with them and was desperate to continue on his way. This mindset is the root cause of this incident. Mr. Linares was scared, frustrated and angry. In his view at the time, he was doing nothing wrong and the USCG was detaining him a mere three miles into international waters. With that said, he knows he over-reacted and caused a situation that could have been diffused quickly and calmly to turn into an unnecessary incident. During the PSR interview, Mr. Linares explained that he never wants to cross paths with the USCG again. He will turn his efforts to farming and fishing from the shoreline and shallow waters when he returned to the Dominican Republic.

#### b. Pretrial Detention, Collateral Consequences, Deterrence, and Family Ties

The parties' plea agreement calls for a sentence between 18 and 20 months. The Guidelines recommend a sentence from 15-21 months. Several factors support a sentence of 18 months. First,

5

this Court can consider the hot days and cold nights Mr. Linares spent aboard the USCG cutter when determining the appropriate level of punishment in this case. At least one USCG official has deemed the cutters "boat prisons" and acknowledged the vessels were "never designed to serve as detention centers." *See* https://www.nytimes.com/2017/11/20/magazine/the-coast-guards-floating-guantanamos.html. The New York Times dubbed the cutters "floating Guantanamos" and in 2017 released an exposé criticizing their use and highlighting the abhorrent conditions. *Cf. United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003) (defendant kept in 23 hour a day lockup for extensive period warranted 2.5 year departure based on conditions of pretrial confinement); *United States v. Carty*, 264 F.3d 191 (2nd Cir. 2001) (defendant kept in 4 by 8 foot cell in Dominican Republic with no running water eligible for departure based on conditions of pretrial confinement).

The collateral consequences of Mr. Linares's arrest and conviction also warrant consideration. He lost his vessel and all his fishing equipment due to this incident and will have a dramatically reduced ability to support his family in the Dominican Republic once he returns. *See, e.g., United States v. Garate,* 543 F.3d 1026, 1028 (8th Cir. 2008) (finding a downward variance reasonable where the district court took into consideration "the lasting effects of being required to register as a sex offender" when evaluating the § 3553 sentencing factors); *United States v. Pauley,* 511 F.3d 468, 474–75 (4th Cir. 2007) (affirming a downward variance where the district court found that the loss of a teaching license and state pension adequately reflected "the need for just punishment" as well as the need for "adequate deterrence"); *United States v. Samaras*, 390 F.Supp.2d 983 (D.N.M. 2005) (loss of public sector job collateral consequence not contemplated by the Guidelines). Mr. Linares will also likely have to spend additional time in immigration custody (despite being arrested in international waters) following his release from BOP custody.

The notion of deterrence must also be addressed. Mr. Linares will return to the Dominican Republic after this case is over. He will not be allowed to come to the United States and has no desire to do so. Indeed, Mr. Linares intends to avoid international waters just so he can avoid any

run-ins with the USCG. Courts throughout the nation have recognized that "[w]hen a defendant will ultimately be removed and sent out of the country, there is less need for the sentence imposed to protect the public from further crimes of the defendant…" *United States v. Ramirez-Ramirez*, 365 F.Supp.2d 728, 733 (E.D. Va. 2005); *United States v. Zapata-Trevino*, 378 F.Supp.2d 1321, 1328-1329 (D.N.M. 2005) ("From a deterrence standpoint … there is nothing to be gained by sentencing Defendant to a forty-one month sentence as a opposed to a fifteen month sentence."); *United States v. Agu*, 763 F.Supp. 703, 704 (E.D.N.Y. 1991) (downward departure warranted where defendant resided in U.S. for significant period of time and would lose that right upon completion of the case).

Finally, Mr. Linares's family situation requires consideration. He has multiple young children who depend on him as a caregiver. Indeed, he is the primary financial support for the family. His family has suffered greatly in his absence. While he may have acted irresponsibly in connection with this case, he truly is a loving and devoted father.


(A representation of who Mr. Linares truly is)

Mr. Linares's family ties and responsibilities warrant consideration by this Court when crafting a sentence "sufficient, but not greater than necessary." *See United States v. Antonakopoulos*, 399

F.3d 68 (1st Cir. 2005) (on remand of bank fraud case, district court could consider defendant's role as a caretaker for brain-damages son even though alternative means of care existed); *United States v. Dominguez*, 296 F.3d 192 (3rd Cir. 2002) (district court erred in concluding it could not depart four levels in bank fraud case for defendant who resided with elderly parents, who were both physically and financially dependent on her).

WHEREFORE, the Defendant, Jose Linares-Cabrera, respectfully requests this Honorable Court sentence him to a term of 18 months incarceration.

**I HEREBY CERTIFY** that on this date I electronically filed the present motion with the Clerk of Court using the CM/ECF system, which will send electronic notification of said filing to all parties of record.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 19th day of August, 2018.

ERIC ALEXANDER VOS
Chief Defender
District of Puerto Rico

***S/Andrew S. McCutcheon***
Andrew S. McCutcheon
Assistant Federal Public Defender
Government No. G02217
241 F.D. Roosevelt Ave.
Hato Rey, P.R. 00918-2441
(787) 281-4922/ Fax (787) 281-4899
E-mail: Andrew_McCutcheon@fd.org